**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Kyle Pertuis, Respondent,

v.

Front Roe Restaurants, Inc., Beachfront Foods, Inc., Lake Point Restaurants, Inc., Mark Hammond and Larkin Hammond, Appellants.

Appellate Case No. 2013-002257

―――――――――

Appeal From Greenville County
Edward W. Miller, Circuit Court Judge

―――――――――

Unpublished Opinion No. 2016-UP-091
Heard October 14, 2015 – Filed February 24, 2016

―――――――――

**AFFIRMED**

―――――――――

John S. Nichols, of Bluestein Nichols Thompson & Delgado, of Columbia, and Curtis Warren Stodghill, of Stodghill Law Firm, of Greenville, for Appellants.

Robert C. Wilson, Jr., of Greenville, for Respondent.

―――――――――

**PER CURIAM:** In this minority shareholder oppression case, Appellants, Front Roe Restaurants, Inc. (FRR), Beachfront Foods, Inc. (BFI), Lake Point Restaurants, Inc. (LPR), Mark Hammond (Hammond) and Larkin Hammond

(Mark and Larkin Hammond, collectively, the Hammonds) appeal from an order making an award of monies to Kyle Pertuis (Pertuis) for his interests in the corporations and for unpaid distributions from the corporate entities, contending the trial court erred in (1) finding an amalgamation of the three corporate entities, but basing an award on their separate values; (2) finding the locus of the amalgamated business was Greenville, South Carolina; (3) awarding respondent a 7.2 % interest in FRR; (4) assigning a "zero" value to BFI instead of a negative value; (5) finding Pertuis was oppressed by Appellants; and (6) ordering payment of $99,117 to Pertuis for unpaid shareholder distributions. We affirm.

From the outset, we note the sole argument of the Appellants contained in the record on appeal presented to the trial court is that from their directed verdict motion following the presentation of Pertuis' case. Only after this court raised concern at oral argument that many of the arguments made by the Appellants in their brief did not appear in the record before us, and, therefore, may not be preserved for our review, did the Appellants' counsel move to supplement the record with over 100 additional pages. We decline to accept this late filing, which would render some of the briefed arguments unpreserved.[1] However, even if we considered those arguments preserved, we would nonetheless affirm.

Because an action for stockholder oppression is one in equity, this court may find facts according to our own view of the preponderance of the evidence. *Ballard v. Roberson*, 399 S.C. 588, 593, 733 S.E.2d 107, 109 (2012). "However, this broad scope does not relieve the appellant[s] of [their] burden to show that the trial court erred in its findings." *Id.* "Furthermore, we are not required to disregard the findings of the trial judge, who was in a better position to determine the credibility of the witnesses." *Id.*

1.     In its order, the trial court found the evidence showed there was a dearth of respect for corporate governance among the three corporate entities, blurring the distinction between them. It concluded, applying the standards articulated in

---

[1] Although counsel for Pertuis stated at oral argument that he believed the issues were properly preserved on appeal—i.e., they had been raised to and ruled upon by the trial court—the record presented to this court fails to support such. "[Our appellate courts] are not precluded from finding an issue unpreserved even when the parties themselves do not argue error preservation to us." *Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012).

*Magnolia N. Prop. Owners' Ass'n, Inc. v. Heritage Cmtys, Inc.*, 397 S.C. 348, 725 S.E.2d 112 (Ct. App. 2012), the Hammonds and Pertuis operated the three corporate entities as a *de facto* partnership of the three corporate entities. On appeal, the Appellants contend the trial court erred in finding an amalgamation of the companies but then ordering an award to Pertuis based upon a separate treatment of each company, arguing the facts supporting amalgamation in *Magnolia* are not present here. They argue the trial court blended the companies into one *de facto* entity, but awarded Pertuis an amount for his separate interest in each company, but Pertuis "cannot have it both ways—either they are an amalgamated entity that should be evaluated as one entity (thus pulling in the negative value of [BFI] to reduce the overall value) in which [] Pertuis owns something less than 10% of the whole, or they are indeed separate entities with separate values and ownership interests and governed by separate state laws."

First, we question whether this issue is preserved on appeal. "[I]t is a litigant's duty to bring to the [trial] court's attention any perceived error, and the failure to do so amounts to a waiver of the alleged error." *S.C. Dep't of Transp. v. First Carolina Corp. of S.C.*, 372 S.C. 295, 301, 641 S.E.2d 903, 907 (2007). To be preserved for appellate review, an issue must have been "(1) raised to and ruled upon by the trial court, (2) raised by the appellant, (3) raised in a timely manner, and (4) raised to the trial court with sufficient specificity." *Id.* at 301–02, 641 S.E.2d at 907 (quoting Jean Hoefer Toal et al., *Appellate Practice in South Carolina* 57 (2d ed. 2002)). "A point not specifically raised to and ruled upon by the trial court will not be considered on appeal." *Sanderson v. Sanderson*, 391 S.C. 249, 255, 705 S.E.2d 65, 67 (Ct. App. 2010). Appellant has the burden of providing this court with an adequate record for review. *Harkins v. Greenville Cty.*, 340 S.C. 606, 616, 533 S.E.2d 886, 891 (2000). There is no indication in the record presented to this court the Appellants ever argued to the trial court, as they do on appeal, that the trial court erred in finding amalgamation of the corporate entities, but then ordering an award to Pertuis based upon a separate treatment of each company.

However, even assuming the matter was specifically raised in the Appellants' motion to alter or amend, we find no merit to the argument. Though the trial court

did cite the *Magnolia*[2] case in its order, which involved amalgamation, the order itself never specifically found the separate entities were amalgamated. Rather, it found Hammond and Pertuis "operated the three corporate [Appellants] as a *de facto* partnership of the corporate entities." Further, the preponderance of evidence supports this finding by the trial court.[3] Thus, even if the facts of this case do not fit the mold of the *Magnolia* case in regard to amalgamation, we discern no reversible error in the trial court's ultimate conclusion that the three corporate entities were operated as a *de facto* partnership. *See McCall v. Finley*, 294 S.C. 1, 4, 362 S.E.2d 26, 28 (Ct. App. 1987) (noting our appellate courts recognize an overriding rule which says: "whatever doesn't make any difference, doesn't matter"). Although they attack the finding of the trial court as not fitting within the parameters of amalgamation in *Magnolia*, the Appellants do not argue why the trial court's finding that the separate entities were operated as a *de facto* partnership would be erroneous. In regard to the Appellants' argument that the trial court erred in inconsistently considering the entities as one, but then considering their separate valuations, the Appellants fail to cite any support for their assertion that such is improper. Rather, they simply summarily argue that Pertuis should not be allowed to "have it both ways." *See State v. Crocker*, 366 S.C. 394, 399 n.1, 621 S.E.2d 890, 893 n.1 (Ct. App. 2005) (holding "conclusory statements unaccompanied by argument and citation to authority are insufficient to preserve an issue for appellate review," and noting failure to provide such argument and citation renders an issue abandoned). Further, there is substantial evidence to support the valuation of the entities separately, instead of as a whole, based on Dr. Alford's testimony. Additionally, we note the Appellants' own expert valued the entities separately.

---

[2] 397 S.C. at 358-59, 725 S.E.2d at 118 (discussing whether the trial court erred in determining the appellants' entities were amalgamated so as to blur the legal distinction between the corporations for purposes of liability).

[3] In particular, there is evidence Pertuis was given the title "Managing Partner." An e-mail from Hammond referred to the parties' partnership. Pertuis referred to them as partners in an e-mail, and in response, Hammond thanked Pertuis for working on their "partnership agreement." In another e-mail, Pertuis discussed the anticipated completion of the "partnership and employment agreements." In his final days of employment, Pertuis discussed his concern of feeling "boxed in" in regard to where he was going with "this partnership" and stated he felt that the "partnership" was only on the surface.

2.     In its order finding the Hammonds and Pertuis operated the three corporate entities as a *de facto* partnership, the trial court further stated, "From [Pertuis'] title, 'Managing General Partner,' from the joint and unified internet web site for the three corporate [Appellants], and from the parties' email, the Court further finds that the *locus* of the partnership is Greenville, SC."  The Appellants assert error in the trial court's finding the locus of the amalgamated business was in Greenville, South Carolina, maintaining the trial court's factual ruling in this regard is without evidentiary support.

As with the "amalgamation" issue, there is nothing to indicate this issue was ever raised to the trial court, thus it is questionable whether this issue is properly before us on appeal.  *See Sanderson*, 391 at 255, 705 S.E.2d at 67 ("A point not specifically raised to and ruled upon by the trial court will not be considered on appeal.").  Further, it is not clear from the Appellants' brief how this finding of the "locus" of the operation prejudices the Appellants.  *See McCall*, 294 S.C. at 4, 362 S.E.2d at 28 ("[W]hatever doesn't make any difference, doesn't matter.").  On the merits, we note the only law cited in support of the Appellants' argument on this issue is that a trial court errs in making findings of fact which have no evidentiary support.  However, there is evidence to support the trial court's finding in this regard.  In particular, as noted by Pertuis, there is evidence that the three entities shared personnel, Pertuis served as the General Managing Partner of each, he relocated to Greenville from where he managed all three, and he travelled to the various locations four to six days a week from Greenville.  Accordingly, we find no error.

3.     The Appellants argue the trial court erred in awarding Pertuis a 7.2 % interest in FRR.  They contend the trial court rejected Pertuis' claim to a 10% interest in FRR, finding he never attained the required profit threshold to achieve such an interest, but then awarded him 7.2 % based upon equitably treating his ownership on a graduated vesting schedule, erroneously relying on *Wilkie v. Philadelphia Life Ins. Co.*, 187 S.C. 382, 197 S.E. 375 (1938) for the proposition that "[e]quity regards and treats as done that which in good conscience ought to be done."  While it is clear the parties contested Pertuis' percentage ownership of FRR, as with the previous two issues, it is not clear the Appellants raised these particular arguments to the trial court.  Accordingly, we likewise question whether these arguments are properly preserved.  *See In re Timmerman*, 331 S.C. 455, 460, 502 S.E.2d 920, 922 (Ct. App. 1998) ("When a party receives an order that grants certain relief not previously contemplated or presented to the trial court, the aggrieved party must move, pursuant to Rule 59(e), SCRCP, to alter or amend the judgment in order to preserve the issue for appeal."); *see also Harkins*, 340 S.C. at

616, 533 S.E.2d at 891 (holding an appellant has the burden of providing this court with an adequate record for review).  However, even assuming the arguments were raised to the trial court, we would find no error.

First, we disagree with the Appellants' assertion that "[t]he [trial] court rejected [] Pertuis' claim to a 10% interest in [FRR], finding that [FRR] never attained the required profit threshold for the 10% ownership interest."  Rather, the trial court recounted the evidence Pertuis presented in support of his claim of a 10% interest and recognized Hammond's contradictory testimony that Pertuis had not achieved 10% interest pursuant to the "missing" vesting schedule.  The trial court specifically noted "the strength of [Pertuis'] argument for 10% ownership from the exchange of emails," and further laid blame for the "missing" vesting schedule on the Hammonds, but ultimately determined it was appropriate to award Pertuis a 7.2% interest in FRR under equitable principles.  Thus, the trial court did not reject Pertuis' 10% claim by finding he had never attained such.  Rather, it found "strength" in Pertuis' claim for 10% ownership in FRR.  It appears the trial court did not give credence to Hammond's testimony that Pertuis had not reached the level necessary under the missing vesting agreement, but did not consider it proper to award Pertuis the full 10% since Pertuis acknowledged his 10% acquisition in the company was tied to profits and Pertuis could not, himself, testify to the specific provisions in the missing vesting schedule.

As to the Appellants' argument concerning application of *Wilkie*, we do not believe the trial court intended to analogize this case to the specific facts in *Wilkie*.  Rather, it simply cited *Wilkie* for the equitable maxim.  Further, though the Appellants argue such maxim is "generally applied in cases involving constructive trusts imposed due to fraud," they cite no law in support of this proposition.  Additionally, the facts of this case do not suffer the same deficiency as those in *Wilkie*, which prevented application of the maxim.  The *Wilkie* case noted, in order to apply the maxim, the party seeking to invoke it must establish "a clear obligation based upon a valuable consideration that another do some act which he has failed to perform."  187 S.C. at 393-94, 197 S.E. at 380.  In *Wilkie*, there was no such obligation.  Here, the Hammonds, arguably, owed a duty to Pertuis to document his greater ownership in FRR based upon his continued management of the various entities.

4.    The Appellants contend the trial court erred in assigning a "zero" value to BFI because the undisputed evidence shows it had a negative value.  They argue Pertuis' expert, Dr. Alford, testified BFI had a negative equity of $410,271, and

their expert, Mr. Manios, valued it at negative $620,000.  Thus, they maintain the trial court's finding lacks evidentiary support.

It is clear the parties disputed the values of the individual entities and presented evidence on the same to the trial court for consideration.  Thus, this issue is preserved for our review.  On the merits, however, we find the preponderance of evidence supports the trial court's determination that BFI had no value.  Dr. Alford placed a fair value of  $0—or no value—on BFI.  In evaluating BFI, Dr. Alford noted the business was not making money and had negative equity.  However, he observed the financial records showed loans to the business from shareholders, but no accrual of interest from those loans.  He testified, if there was no payment of interest, they would be construed as capital investments by the shareholders instead of loans.  If this was the case, it would increase the valuation of BFI from $0 to $46,000.  This testimony is also supported by Dr. Alford's report, which lists negative owners' equity of $410,271 in BFI, places a figure of $456,052 on loans from shareholders, and concludes "[e]xcluding loans to and from shareholders, [BFI] would have a small positive adjusted net asset value."  His report also indicates, "[u]pon sale of each entity, amounts due from shareholders would be collected and amounts due to shareholders would be distributed prior to distributions of net proceeds of the sale," and "[t]he resulting transactions would yield net proceeds of . . . $0 for 100% equity ownership of [BFI]."  The trial court specifically accepted the testimony of Dr. Alford in establishing the values of the separate entities, including that "BFI had no value."  In so doing, it found Dr. Alford "presented an entirely believable and competent analysis for the [trial] [c]ourt's use, based on his credentials and based on his demonstrated application of methodology."  On the other hand, in regard to the testimony of Dr. Manios, the trial court observed he conceded some matters and was not credible in others.  This court is "not required to disregard the findings of the trial judge, who was in a better position to determine the credibility of the witnesses." *Ballard*, 339 S.C. at 593, 733 S.E.2d at 109.  Therefore, there is evidentiary support for the trial court's finding in this regard.

5.     On appeal, the Appellants contend the trial court erred in finding oppression of Pertuis.  They argue the evidence in this case does not demonstrate that Pertuis was in imminent danger of being excluded from returns, his exclusion from management in the companies was self-imposed, and he was offered payment for the value of his ownership.  Therefore, they assert the evidence does not justify the extreme remedy of judicial buyout under a finding of minority stockholder oppression.  The Appellants maintain the indicia of oppression focused on by the court either lacked support in the record or did not rise to the level described in

*Kiriakides v. Atlas Food Sys. & Servs., Inc.*, 343 S.C. 587, 541 S.E.2d 257 (2001) and *Ballard*. They note the trial court mentioned the North Carolina case of *Meiselman v. Meiselman*, 307 S.E.2d 551 (N.C. 1983), and they make the additional argument that North Carolina follows a different standard and the trial court should have applied North Carolina law regarding minority shareholder oppression to the two North Carolina companies, and the application of South Carolina law in this regard was error.

First, we note the issue of whether the trial court erred in finding the Hammonds engaged in oppression of Pertuis as a minority shareholder was clearly raised to and ruled upon by the trial court and is therefore proper for consideration on appeal. On the merits, we find no error. Applying the case law on minority shareholder oppression, in particular *Kiriakides* and *Ballard*, to the facts of this case, we find the preponderance of the evidence supports the court-ordered buyout for minority oppression. In particular, there is evidence of the following oppressive conduct: (a) Hammond failed to provide formal documentation of Pertuis' ownership interest in FRR despite repeated requests by Pertuis and in spite of the fact that the parties began operating under the terms of Pertuis' counterproposal, which had been accepted by the Hammonds and included acknowledgment of Pertuis' increased interest in the entity. (b) The majority failed to offer Pertuis the opportunity to participate in the ownership of real estate leased to LPR. While Pertuis was informed of the acquisition and voiced no objection at the time, it is nonetheless undisputed that the majority did not specifically afford him the opportunity. Further, even assuming their failure to specifically offer Pertuis the opportunity is, alone, insufficient to conclude they misappropriated this corporate opportunity, there is also evidence the majority failed to offer Pertuis the opportunity to participate in the new "Grill Marks" restaurant. Though the Appellants argue Pertuis' employment had ended by that time, we fail to see how this fact precludes him from participation, as he still held an ownership interest in the entities at that time. (c) The majority helped finance the "Grill Marks" restaurant by borrowing $275,000 from FRR and LPR, thus they used corporate assets to aid them in their unilateral acquisition. (d) Because Pertuis is no longer employed by the entities, he no longer derives a salary, bonus, and other benefits he was receiving from the entities. While the Appellants contend Pertuis voluntarily left the business, Pertuis' testimony shows he parted ways only after he tried in vain to have his agreement with the majority formally documented so as to clarify his position and ensure he was receiving his appropriate ownership interest.

Further, there is evidence to support the trial court's finding that the majority continued to frustrate Pertuis' efforts to achieve a 10% interest in FRR "by changing the threshold."[4]  (e) The majority shareholders continued to receive substantial benefits from the corporations, using the corporate assets to help finance another venture.  (f) There were sufficient funds in LPR and FRR to afford a buyout, as evidenced by the fact that LPR loaned approximately $75,000 and FRR loaned approximately $200,000 toward acquisition of the new "Grill Marks" restaurant.  (g) There is a total estrangement between the majority shareholders, who are in total control of the company, and the minority shareholder.  (h) The majority offered the minority shareholder an extremely low buyout offer, in spite of testimony showing substantial value in two of the entities.  Hammond effectively offered Pertuis nothing for his interest in the entities when he offered to pay him only the value of the boat for his shares on the condition that Pertuis would return the boat.  (i) There is no public trading in stock of these closely-held entities.  (j) Pertuis was excluded from management, as evidenced by the fact that he was no longer employed with the companies and had not received any notice of a shareholder's meeting since that time.  (k) The majority either refused to declare dividends or withheld Pertuis' dividends after his employment ended, as evidenced by his testimony he had not received any distributions since parting ways with the Hammonds.  (l) The majority withheld information from the minority.  Pertuis was not kept informed or allowed to participate in the businesses in any way after his termination from employment.  Hammond acknowledged shareholders' meetings were held at least once a year for the three corporate entities, but there were no notices of shareholders' meetings, no agendas sent out, and nothing to show Pertuis was ever afforded a chance to participate in the election of board members or

---

[4] The record shows Hammond accepted Pertuis' counterproposal in his e-mail of June 30, 2009, which provided if Pertuis did not achieve a 10% ownership interest in 2008, the parties would "extend [the] current program through 2009 in order to equalize current ownership at 10% across the board," and "[d]istributions going forward after the close of 2009 [would] be based on 10% ownership."  This is some evidence that they anticipated treating his ownership of FRR as ten percent at that time and, at least certainly going forward, Pertuis was to acquire a ten percent interest in FRR by the close of 2009.  Hammond agreed to, and the parties began implementing certain changes to operate under the counterproposal, yet Pertuis was unsuccessful in obtaining formal documentation of his ownership from the Hammonds, and at the time of this action, the Hammonds maintained Pertuis had only acquired a one percent interest in FRR.

directors. (m) The majority used the corporate assets for their personal benefit and at the expense of the corporations, failing to enforce the rights of the corporations, as Hammond acknowledged they failed to pay interest on their loans from the corporations. (n) The Hammonds resisted Pertuis' request for financial records. (o) The Hammonds used corporate funds to contest Pertuis' shareholder rights, using the same counsel as the corporations to represent them in this action. (p) The Hammonds commingled the bonus and distribution compensation due Pertuis. As in *Ballard* and *Kiriakides*, we find Pertuis "similarly faces prospects of exclusion from the business, a slim chance of seeing a return any time soon, and no market in which to otherwise unload his investment." *Ballard*, 399 S.C. at 595, 733 S.E.2d at 110.

It is questionable whether the Appellants' argument that the trial court was required to apply North Carolina law to Pertuis' claims relating to exclusion from the North Carolina companies is preserved for review, as there is no indication in the record on appeal that this specific argument was ever raised to the trial court. *See Noisette v. Ismail*, 304 S.C. 56, 58, 403 S.E.2d 122, 124 (1991) (holding the Court of Appeals should not address an issue which was not explicitly ruled on by the trial court or brought to the trial court's attention in a motion to alter or amend); *see also Harkins*, 340 S.C. at 616, 533 S.E.2d at 891 (holding an appellant has the burden of providing this court with an adequate record for review). Nonetheless, we note the trial court not only considered South Carolina law, but additionally stated it had "also considered legal authority from North Carolina, submitted by [the Appellants], which provides additional support for the foregoing analysis: *Meiselman*." Thus, the trial court clearly considered *Meiselman*, and the Appellants fail to argue on appeal how the trial court erroneously applied South Carolina law instead of North Carolina law to the North Carolina companies. Finally, the Appellants fail to cite any authority to support their conclusory assertion that the trial court was required to apply North Carolina law to the entities incorporated in North Carolina and that it would be error to apply South Carolina law to the same. *See Crocker*, 366 S.C. at 399 n.1, 621 S.E.2d at 893 n.1 (holding "conclusory statements unaccompanied by argument and citation to authority are insufficient to preserve an issue for appellate review," and noting failure to provide such argument and citation renders an issue abandoned).

6.      The Appellants challenge the award of $99,117 to Pertuis for unpaid shareholder distributions. First, they argue Pertuis did not seek this relief in his pleadings nor specifically testify he was entitled to any amount for unpaid distributions, and the trial court, therefore, exceeded its authority in awarding the same. They additionally maintain, while the court relied on the corporate tax

returns in making its determination on this matter, there was no finding Pertuis did not receive the amounts listed on the K-1 forms or a finding that justifies the amount ordered to be paid to Pertuis. Thus, they argue the record does not support the award of $99,117 for unpaid distributions.

In regard to the Appellants' argument that the trial court exceeded its authority, it is again questionable whether this argument is preserved for our review. *See Timmerman*, 331 S.C. at 460, 502 S.E.2d at 922 (holding, when a party receives an order that grants certain relief not previously contemplated or presented to the trial court, the aggrieved party must move, pursuant to Rule 59(e), SCRCP, to alter or amend the judgment in order to preserve the issue for appeal); *see also Harkins*, 340 S.C. at 616, 533 S.E.2d at 891 (holding appellant has the burden of providing this court with an adequate record for review). Nonetheless, we find no error. In his complaint, Pertuis complained about the impropriety surrounding the distributions, alleging the Appellants "grant[ed] dividends and distributions to the Majority without granting the same benefits to [him]." Further, Pertuis alleged he had suffered damages and asked the court to "fashion relief for [him]" and, in addition to his request for an ordered buyout of his shares, "pray[ed] for such other and further relief as this Court may deem just and proper." Therefore, the award of unpaid shareholder distributions is generally encompassed within the pleadings. At any rate, we would find the issue was tried by consent. *See* Rule 15(b), SCRCP ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."); *Fraternal Order of Police v. S.C. Dep't of Revenue*, 352 S.C. 420, 435, 574 S.E.2d 717, 725 (2002) ("In order to be tried by implied consent, the issue must have been discussed extensively at trial."). The record clearly reflects the issue concerning shareholder distributions was extensively discussed at trial and was tried before the court without objection.

In regard to the amount awarded, as with the Appellants' argument that the trial court exceeded its authority, the record before us does not reflect this argument was raised to the trial court and, therefore, it may not be preserved for appellate review. Nonetheless, the trial court specifically stated it relied on "the corporate [Appellants'] tax returns" in determining the amounts of distributions not paid to Pertuis,[5] and we find some evidence in the record to support such an award.[6]

---

[5] The testimony is clear that the bonuses due Pertuis were disguised as distributions. Dr. Alford's testimony reveals, if a shareholder distribution was

**AFFIRMED.**

**HUFF, A.C.J., and WILLIAMS and THOMAS, JJ., concur.**

---

made to one shareholder (Pertuis), then the other shareholders (the Hammonds) would have also received a distribution proportionate to their share. Pertuis would have then been entitled to the amount of that distribution *as a shareholder*, and any bonus he would have been entitled to would have to be on top of that amount. Thus, amounts he received for bonuses disguised as shareholder distributions meant he was not receiving his proportionate share of distributions to which he would have been entitled.

[6] Specifically, the trial court found Pertuis was entitled to a 7.2% shareholder interest in FRR, and the trial court received in evidence the tax records for FRR. A review of these tax returns for FRR from 2008 through 2012 shows the cumulative ordinary business income, or profit, for those years totals $1,376,481. This figure, multiplied by 7.2%, comes to $99,106.63, which is very close to the award made by the trial court.